Filed 1/8/26  In re A.S. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| In re A.S. et al, Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E085893 |
| Plaintiff and Respondent, | (Super.Ct.No. DPSW2400124) |
| v. | |
| P.S., | |
| Defendant and Appellant. | |
| In re A.S. et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E086322 |
| Plaintiff and Respondent, | (Super.Ct.No. DPSW2400124) |
| v. | OPINION |
| P.S. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County. Sean P. Crandell, Judge. Affirmed.

Konrad S. Lee, under appointment by the Court of Appeal, for Defendant and Appellant P.S.

Jack A. Love, under appointment by the Court of Appeal, for Defendant and Appellant S.R.

Minh C. Tran, County Counsel, Jamila T. Purnell, Assistant County Counsel, and Julie Jarvi, Deputy County Counsel for Plaintiff and Respondent.

To prevail in this juvenile dependency appeal, the parents must demonstrate that the record compelled a finding that offering family reunification services would have been in the children's best interests. The record does not compel such a finding, so we affirm.[1]

## I. BACKGROUND

A.S. (born 2020), L.R. (born 2021), and H.R. (born 2023) resided with defendant and appellant P.S. (Mother) in Hemet. L.R. and H.R.'s father is defendant and appellant S.R. (Father), but A.S. has a different father who is not a party to this appeal.

In April 2024, plaintiff and respondent Riverside County Department of Public Social Services (the department) was informed that two of Father's other children—step-siblings of L.R. and H.R.—had been removed from Father's care in Orange County.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

2

Those step-siblings reported that Father sometimes punished L.R. by burning him with a cigarette lighter. Mother said that although Father did not live with A.S., L.R., and H.R., he frequently took care of them while Mother was at work. A medical summary following an urgent care visit indicated that L.R. had scars on his stomach and on both legs. Mother gave inconsistent stories regarding those scars, telling the social worker that L.R. obtained the injuries from getting "wrapped up in dog wire" in the backyard but telling the urgent care clinic that she did not know where they came from.

The Department filed section 300 petitions alleging that A.S., L.R., and H.R. were at risk of serious physical harm due to the parents' failure to adequately supervise them. (See § 300, subd. (b)(1).) Initially, L.R. was placed in foster care, while A.S. and H.R. were allowed to remain at home. However, A.S. soon revealed that both her parents had hit her with a belt and "put fire on her hand," and a medical review of A.S. and L.R. indicated scars and symptoms that the examiner suspected were the result of physical abuse, so all three children were soon moved into foster care. Specifically, L.R. had "numerous curvilinear and loop pattern scars consistent with past blows with a fold-able object such as a cord, and it is likely that some of the line impacts caused the skin to bleed," and A.S. had blood settling in both eyes consistent with an impact to the forehead. By May 2024, the Department had filed amended petitions alleging that A.S. and L.R., both less than five years old, suffered severe physical abuse from a parent (see § 300, subds. (a), (e)) and that there was a substantial risk H.R. would be similarly abused

3

(see § 300, subd. (j)).  Second amended petitions were later filed to revise allegations regarding A.S.'s father.

At the combined jurisdiction and disposition hearing in June, the juvenile court found all allegations to be true.  It also bypassed family reunification services, finding that sections 361.5, subdivisions (b)(5) and (b)(6) applied.[2]  It accordingly set the matter for a section 366.26 selection and implementation hearing.

In November, Mother filed section 388 modification petitions requesting family reunification services.  She alleged that she had completed a 16-week anger management program, parenting classes, had enrolled in individual counseling, obtained employment, and ended her relationship with Father.

Following an evidentiary hearing, the juvenile court denied the petitions in March 2025.  It terminated both Mother's and Father's parental rights over the children in June 2025.

---

[2]  Under section 361.5, subdivisions (b)(5) and (b)(6), a juvenile court need not provide reunification services to a parent if it finds, by clear and convincing evidence, that "the child was brought within the jurisdiction of the court under subdivision (e) of Section 300 because of the conduct of that parent" or that "the child has been adjudicated a dependent pursuant to any subdivision of Section 300 as a result of . . . the infliction of severe physical harm to the child, a sibling, or a half sibling by a parent or guardian . . . and the court makes a factual finding that it would not benefit the child to pursue reunification services with the offending parent."

4

## II. DISCUSSION

Mother argues that the juvenile court erred in denying her modification petitions, and Father filed an opening brief adopting Mother's arguments without raising additional claims of error. We thus focus on what section 388 requires.

"Section 388 provides for modification of juvenile court orders when the moving party presents new evidence or a change of circumstance and demonstrates modification of the previous order is in the child's best interest." (*In re Malick T.* (2022) 73 Cal.App.5th 1109, 1122; see also Cal. Rules of Court, rule 5.570.) As is the case here, when a party petitions to modify a bypass finding under section 361.5, subdivision (b)(4), (b)(5), or (b)(6), the court "shall modify the order . . . only if the court finds by clear and convincing evidence that the proposed change is in the best interests of the child." (§ 388, subd. (a)(2).) The burden of proof is on the moving party. (*In re S.J.* (2008) 167 Cal.App.4th 953, 959.)

In denying the petitions, the juvenile court determined that Mother had not shown by clear and convincing evidence that reunification services would be in the best interest of the children. "We generally apply the familiar substantial evidence test when the sufficiency of the evidence is at issue on appeal." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1527, disapproved on another ground in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.) "But this test is typically implicated when a defendant contends that the plaintiff succeeded at trial in spite of insufficient evidence. In the case where the trier of fact has expressly or implicitly concluded that the party with the burden of proof did

not carry the burden and that party appeals, it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment. This follows because such a characterization is conceptually one that allows an attack on (1) the evidence supporting the party who had no burden of proof, and (2) the trier of fact's unassailable conclusion that the party with the burden did not prove one or more elements of the case." (*In re I.W.*, *supra*, at p. 1528.) "Thus, where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.'" (*Ibid.*)[3]

The record does not compel a finding that reunification services were in the children's best interests. "First, and probably most basic, any modification under section 388 must consider the seriousness of the reason for the dependency in the first place. Not all reasons for initial dependency jurisdiction are equal from the point of view of a child's interests." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 530.) As the juvenile court noted when denying the petitions, the circumstances giving rise to court involvement

---

[3] Broadly, the standard of review on a section 388 petition is abuse of discretion. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.) But because the petitions here could only have been granted if clear and convincing evidence supported a finding, and the petitions were denied, the standard of review we focus on here is whether that finding was compelled as a matter of law.

were serious: "We have young children as little as two years of age being struck with instruments like cords, belts, and reports that the parents utilized lighters or other hot objects to burn them as punishment. The photographs attached to the various reports show there were marks on the children's bodies, some of which the expert indicated would have been bleeding at the time they were inflicted." Moreover, as the juvenile court noted, "both parents actively participated in the abuse," and both "[p]arents, including mother, provided explanations that were inconsistent with the opinions of the experts and forensic examiners."

Although Mother has since completed multiple parenting programs and her visits with the children generally went well—the juvenile court noted that Mother "was exhibiting behavior that one would want her to during those visits"—the evidence on the strength of Mother's bond with the children is conflicting at best. (See *In re Kimberly F.*, *supra*, 56 Cal.App.4th at p. 531 ["the strength of the existing bond between the parent and child" is another "important factor"].) Mother emphasizes that in January 2025, A.S. told the social worker that "she wanted to live with her mother as she missed her." While that statement is true, Mother fails to mention that A.S. quickly revised her answer to state that she would prefer to live with the caregiver after L.R. stated that he preferred the caregiver. According to one of the department's reports: "On January 9, 2025, I spoke to the children, [A.S. and L.R.], at their current placement. When [A.S.] was first asked about her desire to return to her mother's home, she paused and look[ed] confused. She later commented that she wanted to live with her mother as she missed her. I asked

7

[A.S.] what she likes about visits with her mother, and she reported she likes how the mother brings toys and food to visits, and she likes seeing the mother. [¶] When I asked [L.R.] if he wanted to live with his mother or the caregiver, he stated, 'Marie's House' (which is the caregiver). Then [L.R.] proceeded to go to the caregiver and hug her. Afterwards, [A.S.] revisited the conversation and indicated that she wanted to remain with her caregiver. I asked her, 'So do you want to live with mom or Marie's house?' She stated, 'Marie's House!' As I documented her response in my notebook, [A.S.] asked, 'Does that say I want to live here?' I said, 'Yes.' Then asked, 'Is that okay? Is that what you want?' [A.S.] expressed, 'Yes, that is okay.'"

Moreover, in a March 2025 report, the department noted concerns about the children's behavior: "[D]uring visitations, the children are always eager to see what the mother brings them, and it is hard to differentiate whether they are happy and excited to see the mother or the material things she provides to them. [A.S.], during every visit, asks the mother if she brought toys for her and he[r] siblings. When the mother tells [A.S.] she did not bring new toys, [A.S] appears sad. [L.R.] is constantly trying to open all the items the mother brings for them. Also, [L.R.] appears to be rebellious against the mother's request for help or to behave. [H.R] had a tantrum while being taken to the visitation room, to the point where her former caregiver had to pick her up and place her in the room with the mother and the siblings. During that visit [H.R.] was seen looking outside the door of the room and would constantly say what appeared to be 'Marie,' which was the former caregiver's name. Additionally, during a visit on February 27,

8

2025, [A.S] repeatedly slapped the mother . . . and had a tantrum, where the mother was unable to comfort her and calm her down." This shows that, as late as when the juvenile court was deciding the modification petitions, Mother's bonds with the children were arguably dependent on whether she bought gifts for them, and Mother had difficulty controlling their behavior.

Finally, the record suggests that Mother was not being fully transparent with the department about her capacity to provide for the children. In a January 2025 report, the department noted that Mother "reported that she would be relying on friends and members of her church to watch her children while she [was] at work" but "refused to provide the name of her church or potential church members who would interact and provide care for her children." Mother also "reported that she has been diagnosed with anxiety and adjustment depression" but was "unable to provide any documentation as to her diagnosis or the providers['] contact information." The department's concerns grew over the next two months. In its March 2025 report, it said Mother "has not been forthcoming and has been evasive to the Department's questions and requests[] regarding her home assessment, employment, and availability." Although the department attempted to make unannounced home visits, Mother "provided excuses as to the reason why she is not home or why she did not answer the door." The department then detailed two such instances, one where Mother texted the social worker to say that she had been sleeping, and another where Mother said she was at an appointment (but "was evasive to

answer" questions about appointment details).  The department also noted that Mother would be "dismissive" or "not respond" when asked about her work schedule.

In sum, "[t]his is simply not a case where undisputed facts lead to only one conclusion."  (*In re I.W.*, *supra*, 180 Cal.App.4th at p. 1529.)  Jurisdiction over the children was premised on severe physical abuse, the evidence on the children's bond with Mother was mixed, and there were questions about mother's honesty and ability to provide for the children.  The parents have not shown that the trial court erred in denying Mother's modification petitions.

### III.  DISPOSITION

The March 27, 2025 orders denying the section 388 petitions and the June 12, 2025 order terminating parental rights are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAPHAEL _____
J.

We concur:

CODRINGTON _____
Acting P. J.

MENETREZ _____
J.